2017 PA Super 77

| JOHN T. NICHOLAS AND BRETT STROTHERS, T/A NICHOLAS AND STROTHERS, A PARTNERSHIP | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| DREW M. HOFMANN, INDIVIDUALLY; THE ESTATE OF CONRAD J. HOFMANN, DREW M. HOFMANN, EXECUTOR; CONRAD G. HOFMANN, JR., INDIVIDUALLY AND KEEHOF BAR, INC. | |
| | No. 2567 EDA 2015 |

Appeal from the Judgment Entered October 6, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): September Term, 2013 No. 02154

BEFORE:  BOWES, J., OTT, J., and SOLANO, J.

OPINION BY SOLANO, J.:                    **FILED MARCH 24, 2017**

Plaintiff Nicholas and Strothers ("N&S"), a Pennsylvania partnership formed by John T. Nicholas (deceased) and Brett Strothers, appeals from a judgment, following a bench trial, that was entered in favor of the defendants in its mortgage foreclosure action and that voided a deed that transferred real estate to N&S. After careful review, we vacate the judgment and remand for further proceedings.

This case presents a complex set of facts that has been made more complex by a series of factual and legal errors made by the parties prior to and throughout these proceedings. Adding to the confusion is the fact that principals to the underlying transaction, Mr. Nicholas and Conrad J.

Hofmann, are deceased, and those available to testify at trial displayed a woeful lack of personal knowledge about the facts. The evidence left the trial judge to conclude that there is such a lack of agreement about the facts that there is no viable mortgage contract to enforce. We conclude that, because of errors in the trial court's analysis, it is necessary for the trial court to reexamine the validity and enforceability of the mortgage. We also conclude that our rules of procedure did not permit the trial court to entertain an action to void the deed.

Conrad J. Hofmann owned the real property at issue, which is located at 551 East Cambria Street in Philadelphia. He also owned all of the stock of Keehof Bar, Inc., a Pennsylvania corporation which operated a bar and restaurant on that property. Trial Ct. Op., 1/4/16, at 3.

Conrad J. Hofmann had two sons: Drew M. Hofmann and Conrad G. Hofmann. Tr. Ct. Op. at 3. In the trial court, the parties referred to Conrad J. Hofmann as "Conrad J. Hofmann, Sr." and to Conrad G. Hofmann as "Conrad G. Hofmann, Jr." For ease of reference, this opinion refers to that father and son as "Conrad Sr." and "Conrad Jr."

On May 10, 2010, Drew Hofmann, acting as agent for his father, executed a first mortgage on the Cambria Street property to secure a $32,000 loan from John H. Marg. Trial Ct. Op. at 3.

On July 26, 2010, Conrad Sr. died. Trial Ct. Op. at 3. In his Last Will and Testament, he bequeathed the Cambria Street property and all shares of Keehof Bar to his sons, giving Drew 51% of the real estate and stock and

giving Conrad Jr. 49%. *Id.* at 3-4; Last Will and Testament ("Will"), Ex. P-2, § IV. The Will named Drew as Executor of the estate[1] and gave him and any successor executors broad general fiduciary powers, including the power to compromise claims and, "[s]ubject to the other provisions of this [W]ill, to alter, repair, improve, sell, mortgage, lease, exchange, or otherwise develop, operate, or dispose of any real or personal property at any time for such prices and on such terms and in private or public transactions as they deem appropriate, without any liability on the purchasers to see to the application of the purchase money." Will § VI(C), (D). The Will listed some outstanding debts of the decedent, *id.* § I,[2] and contained a protective provision regarding claims against the estate, *id.* § VII. [3]

_____

[1] Letters testamentary were granted to Drew on August 10, 2010, by the Surrogate Court of Cape May County, New Jersey. Trial Ct. Op. at 3.

[2] The Will's first section, entitled "Debts and Funeral Expenses," listed debts owed to Conrad Sr.'s brother, sister-in-law, daughter-in-law, and sister. Will § I. Relevant to this appeal, it did not list any debt owed to Mr. Nicholas or John Marg. *See id.*

[3] The Will's seventh section, entitled "Protective Provisions," stated in full:

> To the extent permissible by law, no interest in income or principle hereunder shall be subject or liable to anticipation, sale, assignment, pledge, debts, contracts, engagements, orders, liabilities, nor be subject or liable to levy, attachment, execution, sequestration, or seizure under any legal, equitable, or other processes.

Will § VII.

On November 8, 2010, Drew executed a promissory note and mortgage on the Cambria Street property, and this note and mortgage are the principal sources of the issues in this action. The promissory note documented a debt owed to N&S. It stated that "the Estate of Conrad J. Hofmann, Drew M. Hofmann, executor" promised to pay N&S $195,000 plus interest. Mortgage Note, Ex. P-5. In capital letters, the note added:

> THIS IS A COMMERCIAL LOAN FOR COMMERCIAL PURPOSES. THE LOAN IS A FIRST LIEN ON THE PROPERTY. THE SUM OF $140,000 WAS ADVANCED DURING THE LIFETIME OF CONRAD HOFMANN MAINLY TO FINANCE CON HOF MUSIC, LLC, ROSELANE MUSIC, LLC WHICH OPERATED OUT OF WILDWOOD, NEW JERSEY. SOME OF THE MONEY WAS USED TO MAKE MORTGAGE PAYMENTS ON THE HOUSE OWNED BY CONRAD HOFMANN AT 6210 SEAVIEW AVENUE WILDWOOD, NEW JERSEY, AND ALSO TO PAY OBLIGATIONS FOR KEEHOF BAR, INC., IN PHILADELPHIA. THE PARTIES AGREE THAT JOHN T. NICHOLAS ADVANCED $140,000.00 ON THE DATE OF THIS NOTE INCLUDING ACCRUED INTEREST, IF ANY. BRETT STROTHERS ADVANCED $55,000.

*Id.* The note was due and payable on December 1, 2012, and interest was due in monthly installments during the term of the note. The note stated it was "JOINED BY KEEHOF BAR, INC. . . . as a guarantor," and it authorized N&S to file a financing statement against the stock of the bar. *Id.* The signature block on the note read:

> Intending to be legally bound, the party hereto has affixed her [*sic*] hand and seal the day and year first above written.
>
> *Estate of Conrad Hofmann, deceased*
>
> By  DREW M. HOFMANN          (SEAL)
> Drew M. Hofmann, Executor

DREW M. HOFMANN_____ (seal)
Drew M. Hofmann

KEEHOF BAR, INC., a
Pennsylvania business Corporation

By _DREW M. HOFMANN_____
   Drew M. Hofmann
   President and sole shareholder

*Id.*

Like the note, the mortgage also was between the "Estate of Conrad J. Hofmann, Drew M. Hofmann, executor" and N&S. Mortgage, Ex. P-4. It provided:

> Whereas, mortgagor has executed and delivered to mortgagee a certain mortgage note of even date herewith, payable to the order of mortgagee in the principal sum of One hundred, Ninety Five Thousand Dollars ($195,000.00[)] and has provided therein for payment of any additional moneys loaned or advanced thereunder by mortgagee, together with interest thereon at the rate provided in the note, in the manner and at the times therein set forth, and containing certain other terms and conditions all of which are specifically incorporated herein by reference; THIS MORTGAGE SHALL BE DUE AND PAYABLE IN FULL WITHOUT FURTHER DEMAND FOR PAYMENT OF SAME ON DECEMBER 1ST, 2012. Interest only shall be due on this mortgage until the due date of December 1st, 2012.
>
> Now therefore, mortgagor, in consideration of the debt or principal sum and as security for the payment of the same and interest as aforesaid, together with all other sums payable hereunder or under the terms of the note, grants and conveys to mortgagee, its successors and assigns all the lots or pieces of ground situated in Carbon County [*sic*], Pennsylvania, more specifically described as follows:

*Id.* The mortgage then proceeded to describe the Cambria Street property in Philadelphia, including an address, metes and bounds description, tax assessment number, and title history. *See id.*[4] The mortgage was signed by Drew M. Hofmann as Executor for the Estate of Conrad Hofmann, and, unlike the note, it provided for Drew to sign the document only once. *Id.* The mortgage contained an acceleration clause and a clause permitting N&S to confess judgment against the estate. *Id.* At the same time as the parties entered into this mortgage, N&S fully satisfied the earlier mortgage on the property with a payment to John Marg. Trial Ct. Op. at 4, ¶ 8; N.T. at 38, 53-54, 87.

In addition to the mortgage, Drew, again as executor of his father's estate, signed an "Irrevocable Stock Power" which transferred to N&S 100 shares of Keehof Bar stock. The bar had issued a certificate for those shares a few weeks earlier. *See* Trial Ct. Op. at 4-5; Certificate, Ex. P-8.

Drew tried to use the N&S loan proceeds to reopen Keehof Bar and make it profitable, but was unsuccessful. After a few months, the Hofmann Estate failed to make the monthly interest payments required by the note, and on September 27, 2011, N&S confessed judgment against Drew Hofmann in the Court of Common Pleas of Carbon County. Trial Ct. Op. at 6. The court struck the confessed judgment in July of 2012. *Id.*

---

[4] No party has argued to this Court that the mortgage's erroneous statement that the property was "situated in Carbon County" rendered it invalid.

On January 25, 2012, Conrad Jr., "as heir of the Estate of Conrad J. Hofmann, deceased," executed a deed conveying "ONE HALF INTEREST" in the Cambria Street property to N&S for $5,000. Trial Ct. Op. at 6; Deed, Ex. P-3.[5] The deed explained that Conrad Sr. had died and left a Will providing that his residuary estate would be divided equally between Drew and Conrad Jr., so that "both have been vested with a 50% interest in the real estate described herein by operation of law." Trial Ct. Op. at 6; Deed, Ex. P-3 (quoting Will § V). In citing the Will's provision for an equal disposition of the estate's residue to Drew and Conrad, the deed overlooked the fact that a different provision of Conrad Sr.'s Will, Section IV, stated that Conrad Sr. gave Conrad Jr. only 49% of the Cambria Street property.[6]

_____

[5] Strothers later explained the reason for this transaction:

> I believed in the current condition with the amount of debt imposed upon [the property], that it was a beneficial situation for both ends, including us and Conrad, to come out of the situation with some sort of money in his pocket and to peaceably walk away in a gentleman's fashion.

N.T. at 101-02.

[6] The deed was drafted by a lawyer for Nicholas, Anthony Roberti, the same person who drafted the note and mortgage. Roberti testified that when Conrad executed the deed, he had an interest "only as an heir of the estate," but that pursuant to Pennsylvania law, "after one year . . . it automatically goes to the heirs if nothing is done with the estate. So — and it's been longer than that now. It was just a matter of simplifying the procedure." N.T. at 21. Strothers testified that the deed's statement that it conveyed 50% of the property, even though Conrad was to inherit only 49%, was an error. *Id.* at 101.

N&S filed a complaint to foreclose on the mortgage on September 19, 2013. Trial Ct. Op. at 6. As amended, the complaint named as defendants: Drew M. Hofmann, individually; Drew M. Hofmann, as Executor of the Estate of Conrad J. Hofmann, deceased; Conrad G. Hofmann, Jr., individually; and Keehof Bar, Inc. Trial Ct. Op. at 1; *see* Am. Compl., 6/9/14.

On November 6, 2014, a default judgment was entered in favor of N&S and against Conrad Jr. for failure to file an answer within the required time. Trial Ct. Op. at 1-2. Three days later, Nicholas died, and on November 20, 2014, N&S filed a Suggestion of Death to alert the court that Strothers would be continuing the action on behalf of the partnership. Suggestion of Death at 1-2.[7]

On December 26, 2014, the remaining defendants filed an Answer and Counterclaim to Quiet Title, citing Pa.R.C.P. 1061(b)(3). Trial Ct. Op. at 2; Answer to Second Amended Compl. with Countercl. to Quiet Title and Affirmative Defenses, 12/26/14. The defendants claimed that the mortgage was procured by fraudulent inducement and was void and invalid because Drew never registered as an executor in Pennsylvania and therefore lacked authority to enter into it. *Id.* at ¶ 33. In addition to alleging fraud, the counterclaim averred that N&S was dissolved as a partnership by operation of law upon Nicholas' death and therefore could not maintain the mortgage

---

[7] The document erroneously stated that "John T. Strothers has passed." Suggestion of Death at 2.

foreclosure action, and that Conrad Jr.'s deed of one-half of the property was "defective and invalid." *Id.* at ¶¶ 32, 33, 41. In an answer to the counterclaim, N&S averred that the counterclaim was invalid under Rule 1148 of the Rules of Civil Procedure "as [the] claim does not relate to the origination of the mortgage." Pl.'s Ans. To Def.'s New Matter and Affirmative Defenses, 1/14/15, at ¶ 32.

On July 13, 2015, the trial court held a non-jury trial. Trial Ct. Op. at 3. A major focus of the trial was on the meaning of the terms of the note and mortgage, including, in particular, the $195,000 amount of the loan and the capitalized paragraph in the note regarding the $140,000 portion of the loan that was an advance. In this respect, each side presented conflicting evidence, including extrinsic evidence, regarding the documents. N&S presented the testimony of Attorney Anthony Roberti, Esquire, and Brett Strothers. *Id.* at 2. Defendants presented the testimony of Drew Hofmann. *Id.*

Roberti, who had previously represented Nicholas in other matters, testified that he drafted the note and mortgage on November 8, 2010, at a meeting in his office where Nicholas, Drew Hofmann, and William Gaffney[8]

---

[8] Roberti did not mention William Gaffney by name, but referred to him as Drew's financial advisor. N.T., 7/13/15, at 10. Strothers testified that William Gaffney was Drew's financial advisor who helped negotiate the mortgage deal. *Id.* at 73, 79. Drew testified, however, that Gaffney was not a financial advisor. *Id.* at 156.

were present. Tr. Ct. Op. at 4; N.T., 7/13/15, at 9-11.[9] Roberti testified that Drew was not represented by counsel, but that in the middle of the meeting Drew called and spoke with his attorney for fifteen minutes. *Id.* at 11, 47.

Roberti testified that $140,000 had been loaned by Nicholas to either Conrad Sr. or to Drew Hofmann while Conrad Sr. was alive. N.T., 7/13/15, at 32-26, 41, 43-44. Roberti did not know how that money was used. Roberti said some of the $140,000 was used to pay residential mortgages, but believed it was a small amount. *Id.* at 32-36, 42. He was not sure whether the money was used to make payments on a house owned by Conrad Sr. or Conrad Jr. *Id.* at 33. Roberti believed that all or most of the $140,000 had been given directly to Drew. *Id.* at 36, 43-44. He could not provide evidence substantiating the $140,000 debt, and he testified he was never given a detailed itemization of it. *Id.* at 32-37, 44-45, 48.[10]

According to Roberti, the remaining $55,000 of the $195,000 loan amount was advanced by Strothers and distributed on the date of the note's execution, November 8, 2010. N.T. at 35. He claimed that some of that money went to paying off the $29,500 balance due on the first mortgage, as

---

[9] Roberti initially testified that Strothers was also present, N.T. 10, but then became unsure, N.T. 37. Strothers testified that he was on a speakerphone the day the mortgage was created. *Id.* at 81.

[10] A spreadsheet introduced at trial as Exhibit P-9 says that $140,000 was "already advanced" by John T. Nicholas, but does not include a breakdown of this amount or specify to whom it was given.

well as gas bills, water bills, and real estate taxes on the property. *Id.* at 35, 38-39, 53-54. Roberti testified that he distributed $34,754 on the day of the mortgage, but also said it was "more than that. Something like $50,000." *Id.* at 38, 48. He did not bring to court the records of the checks he issued that day. *Id.* at 61-62.[11]

Roberti stated that he included in the note whatever language the parties instructed him to include, in order to make the note as detailed as possible. N.T. at 31, 34. Roberti testified that he read both the mortgage and note aloud in Drew's presence. *Id.* at 46; *see also id.* at 33.

Plaintiff Strothers testified that —

Nicholas brought the matter to me, the opportunity that he had a family friend that he had advanced money to previously, and he had just passed away, and there was a looming foreclosure[12] coming over a business asset that the family had,

---

[11] The spreadsheet introduced at trial shows that Brett Strothers "already advanced": $17,950 (no description listed), $735 ("cash to Drew Hofmann 11/3/10"), $1,000 ("TD Bank Roselane MC Center 11/5/10"), $548 ("Liquor Control Board"), and $13.65 ("USPS"). Ledger, Ex. P-9. Combined with the $140,000 "already advanced" by John T. Nicholas, these amounts total $160,246.65; they were listed on the spreadsheet as the "TOTAL ADVANCED TO DATE." *Id.* Under the heading "I HAVE $34,754 TO DISTRIBUTE," the spreadsheet showed distributions of $29,500 to John H. Marg, and $5,254 to Drew M. Hofmann. *Id.* We note that the amounts advanced ($160,246.65) and the amounts distributed ($34,754) total $195,000.65. The ledger also includes a column, "TO BE PAID BY HOFMANN/not paid at closing," which includes amounts for City of Philadelphia Real Estate Taxes, Gas Services, and a Water bill, which total approximately $12,000. *Id.*

[12] On cross-examination, Strothers recalled the first mortgage being a 2008 two-year mortgage; however, Defendants' counsel pointed out that the
*(Footnote Continued Next Page)*

and he had some outstanding debt, and to prevent trying — to kill two birds with one stone, to prevent a foreclosure on the bar and also secure his debt, I came on board by buying out a previous mortgage that was about to foreclose and also provided additional funds to get the bar up and running again that had previously been closed so he could provide income for Mr. Hofmann, Drew.

. . .

The purpose of the mortgage [for $195,000] was that most of this money was advanced to Drew and his businesses with the credit history of Drew's father who was still alive at the time. Once he passed away, John Nicholas was worried he would not be able to collect based on history and wanted to secure his debt in some form or another.

*Id.* at 69-74.

Strothers testified that the $140,000 was comprised entirely of loans to Drew based on his father's credit backing. N.T. at 73-74, 76, 88-89, 91. He had seen checks written from Drew and Drew's businesses to Nicholas in repayment for loans, but Strothers said that Nicholas would not cash the checks because they would bounce. *Id.* at 77, 89-90. The parties to the mortgage finally agreed on the amount of $140,000 following days of negotiations. *Id.* at 73, 79. Strothers testified that part of the $55,000 that he provided was used to pay off the first mortgage, but he did not specify how the rest of the $55,000 was allocated. *Id.* at 80, 86-87.[13]

_____
*(Footnote Continued)*

mortgage with John Marg was dated just six months before the instant mortgage, and did not specify a due date. N.T. at 85-86.

[13] Strothers testified that he paid $39,500 to satisfy the first mortgage. N.T. 87. As previously noted, the spreadsheet stated and Roberti testified that $29,500 was used to satisfy the first mortgage.

- 12 -

Defendant Drew Hofmann testified that the intention behind the mortgage at issue was to obtain funds to reopen the bar and then pay back the mortgage loan with the bar profits. N.T. at 152-53, 156. When asked about the $140,000 debt, Drew said that "there really wasn't an understanding." *Id.* at 153-54. He said he never received the $140,000 loan and that in the past Nicholas had lent him $30,000 at most. *Id.* at 166.

Regarding the $55,000, Drew admitted that he "signed" for it, and that the $55,000 "given to him" was "a loan to open the bar." N.T. at 153. He said that of the $55,000, approximately $17,000 was "given towards the builders" and "given to other people to open the bar, get the bar open, and the difference to John Marg." *Id.* at 156. At the same time, Drew testified that he personally received $5,000, and that he believed that was all he was "signing for." *Id.* at 153-54, 156.

Drew testified that he read and signed the mortgage, and that he understood that if he failed to make payments he would be in default. N.T. at 175-78. He admitted that he made only two payments under the mortgage. *Id.* at 176-78. He also testified that N&S promised him additional funds to help open the bar, but that agreements regarding the additional funds were not included in the written mortgage documents. *Id.* at 156-59; 175-76. The additional funds were never provided, which was why Drew was unsuccessful at reopening the bar and turning a profit early enough to repay the mortgage as planned. *Id.*

At the conclusion of N&S' case, the defendants moved for a directed verdict on behalf of Defendants Keehof Bar and Drew Hofmann, individually. Trial Ct. Op. at 2. The Court granted the motion with respect to Keehof Bar only. **Id.**

The day following the trial, the trial court issued an order which struck both the mortgage and deed as void, quieted title on the property in favor of Defendants, and barred N&S from making any future claims on the property. Order, 7/14/15. The full text of the trial court's order reads:

> AND NOW, this 14th day of July, 2015, upon consideration of the pleadings and after a non-jury trial in this Foreclosure action, it is hereby ORDERED and DECREED as follows:
>
> 1) Judgment is entered in favor of Defendants, Drew M. Hofmann, Conrad G. Hofmann, Jr., and [Keehof] Bar, Inc., and against Plaintiffs, John T. Nicholas, Brett Strothers, t/a Nicholas and Strothers, a Pennsylvania partnership;
>
> 2) The Mortgage dated November 8, 2010, executed by Drew M. Hofmann, Executor of the Estate of Conrad J. Hofmann, Sr., and recorded on November 16, 2010 in the Department of Records of Philadelphia County under Document No. 52282705, and assigned to John T. Nicholas and Brett Strothers, a Pennsylvania partnership known as Nicholas and Strothers by Assignment recorded November 16, 2010 in the Department of Records of Philadelphia under Assignment No. 36N6-105, for the Property 551 East Cambria Street, Philadelphia, Pennsylvania 19134, described more fully in Exhibit "A" attached hereto ("Property") is unenforceable and is hereby marked VOID and CANCELLED[14];

---

[14] As N&S has noted, the order refers to the mortgage at issue as assigned, but there is no suggestion that it did not originate with the partnership. Pl.'s Post-Trial Mot. at ¶ 26-27.

3) Plaintiffs, John T. Nicholas, Brett Strothers, and the partnership known as Nicholas and Strothers, his/its successors and assigns, and/or anyone claiming under, by or through him/it, are forever barred from asserting any right, lien, mortgage, title or interest in the Property 551 East Cambria Street, Philadelphia, Pennsylvania 19134;

4) The Commissioner of the Department of Records of Philadelphia County is directed to record a certified copy of this Order and to void the Mortgage to properly acknowledge that the Mortgage dated November 8, 2010, and recorded in Philadelphia, Pennsylvania under Document No. 52282705, and assigned to John T. Nicholas and Brett Strothers, a Pennsylvania partnership known as Nicholas and Strothers by Assignment recorded November 16, 2010 in the Department of Records of Philadelphia under Assignment No. 36N6-105, is removed from record;

5) The Deed dated January 25, 2012, purporting to transfer title of the Property located at 551 East Cambria Street, Philadelphia, Pennsylvania 19134, from Conrad G. Hofmann, as heir of the Estate of Conrad J. Hofmann, to John T. Nicholas and Brett Strothers, a Pennsylvania partnership known as Nicholas and Strothers recorded in Philadelphia Recorder of Deeds on January 27, 2012 under Document No. 52439964, described more fully in Exhibit "B" attached hereto ("Deed"), is declared VOID and CANCELLED as of record;

6) Plaintiffs, John T. Nicholas, Brett Strothers, and the partnership known as Nicholas and Strothers, and all persons claiming under him and/or it, are forever barred from asserting any right, lien, title or interest in the Property identified as 551 East Cambria Street, Philadelphia, Pennsylvania 19134, and title to the Property is hereby QUIETED in favor of Defendants, Drew M. Hofmann and Conrad G. Hofmann, Jr., as Tenants in Common (Fifty-One percent (51%) to Drew M. Hofmann and Forty-Nine percent (49%) to Conrad G. Hofmann), against all claims of the Plaintiffs;

7) The Commissioner of the Department of Records of Philadelphia County is further directed to record a certified copy of this Order to properly acknowledge Defendants, Drew M. Hofmann and Conrad G. Hofmann, Jr., as the legal owners of the

Property 551 East Cambria Street, Philadelphia, Pennsylvania 19134;

8) Defendants are responsible for obtaining a certified copy of this Order from the Prothonotary's Office. Defendants are also responsible for giving certified copies of this Order to the Document [R]ecording Division of the Department of Records.

*Id.*

Later, in an opinion filed under Appellate Rule 1925(a), the court explained that it found the mortgage unenforceable "because (1) the parties did not have a meeting of the minds and (2) there was a lack of consideration." Tr. Ct. Op., 1/4/16, at 8. The court stated:

The parties did not agree upon the essential terms in the Mortgage agreement; thus, contractual formation never occurred. The lack of mutual assent was apparent from the plain language in the Mortgage Note; it stated, in part, that "the sum of $140,000 was advanced during the lifetime of Conrad Hofmann . . . ." In the same paragraph, it stated, "[t]he parties agree that John T. Nicholas advanced $140,000.00 on the date of this note including accrued interest, if any . . . ." These two clauses are clearly contradictory; both cannot be true. The parties disputed a single loan in the amount of $140,000.00; that loan could not have been distributed twice — once during the lifetime of Conrad Hofmann and once on November 8, 2010, the date of the Note. Moreover, Conrad Hofmann, Sr. was not alive on November 8, 2010.

The lack of mutual assent was also demonstrated by the conflicting testimony of Brett Strothers and Defendant Drew Hofmann at trial. These parties disagreed about the material terms of the Mortgage agreement, including who received the $140,000.00 referenced in the Note. Although the Note stated that $140,000.00 was advanced during the lifetime of Conrad Hofmann, Brett Strothers testified that the money was advanced to Defendant Drew Hofmann. . . .

- 16 -

Defendant Drew Hofmann, however, testified that he never received the $140,000.00 referenced in the Note; he only received $5,000.00. . . .

Even Mr. Roberti, a licensed attorney and drafter of the Note, disagreed about the material terms of the Mortgage agreement. According to Mr. Roberti, the sum of $140,000.00 was either advanced to Conrad J. Hofmann Sr. or Conrad G. Hofmann, Jr. . . .

The inconsistency and ambiguity with regard to these essential terms demonstrates the lack of mutual assent between the parties. Moreover, the testimony demonstrated that the nature and extent of the parties' obligations was not certain. As such, this Court properly found that the mortgage was unenforceable, in part, because there was no meeting of the minds.

*Id.* at 8-11 (citation to record omitted).

The court also concluded that the mortgage was unenforceable because it was supported by past consideration. Citing the "general rule that past consideration is not sufficient to support a subsequent promise where the writing does not contain an express statement that the signer intends to be legally bound," the court stated that the "past act of advancing $140,000.00, prior to the execution of the Mortgage, did not constitute consideration sufficient to create a binding contract." Tr. Ct. Op., 1/4/16, at 11-12.[15] In addition, the court concluded that entry into the mortgage by Drew, as Conrad Sr.'s executor, was prohibited by the protective provisions

---

[15] The court noted that there was no evidence of any past debt by Conrad Sr. to Nicholas in Conrad Sr.'s Will, even though the Will listed various debts owed by Conrad Sr. Tr. Ct. Op. at 12-13.

- 17 -

of Conrad Sr.'s Will, which, the court believed, prevented creditors from asserting claims against the estate, and that the mortgage and note violated the Statute of Frauds. *Id.* at 15-16.

The court said it voided the January 25, 2012 deed of the Cambria Street property from Conrad Jr. to N&S because the deed "purported to convey a greater share of the Subject Property than Conrad G. Hofmann Jr. owned." Tr. Ct. Op. at 16. In addition, the court said the deed was invalid because Conrad Jr. had not yet received his interest in the estate at the time he made the deed. *Id.* at 17.

On July 24, 2015, N&S filed a timely Post-Trial Motion for Judgment Notwithstanding the Verdict. Trial Ct. Op. at 2. It argued that the evidence at trial supported enforcement of the mortgage, and that the trial court's order invalidating the January 25, 2012 deed exceeded the bounds of a foreclosure action as defined by the Rules of Civil Procedure. Post-Trial Mot. (citing Pa.R.C.P. 1141 to 1150). N&S' brief in support of its motion claimed that "the preponderance of the evidence at trial supports the court finding in favor of the Plaintiff." Pl.'s Br. in Support of Post-Trial Mot. at 3-4 (excessive capitalization removed). The trial court denied the motion on August 5, 2015. Trial Ct. Op. at 2.

N&S filed a Notice of Appeal to this Court on August 6, 2015. It filed a Statement of Matters Complained of on Appeal with the trial court on

August 31, 2015.[16] On October 6, 2015, the court entered judgment, thus perfecting this appeal. *See generally **Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*).

On appeal, N&S raises the following issues:

1. Did the trial court err in determining that the Mortgage securing the Note was unenforceable for a lack of consideration despite satisfying the Statute of Frauds with the language "intending to be legally bound"[?]

---

[16] The Statement raised the following issues:

1. The Trial Court erred in finding that the Mortgage was unenforceable because the debt was not acknowledged in the decedent's Last Will and Testament.

2. The Trial Court erred in finding that the Mortgage was unenforceable as the parties did not have a meeting of the minds.

3. The Trial Court erred by finding the Mortgage was unenforceable for a lack of consideration.

4. The Trial Court erred in finding that the exercise of the Irrevocable Stock Power by the Plaintiff to [] transfer the liquor license was improper and thereby violated the Mortgage.

5. As a matter of Law, the incontrovertible evidence adduced through the trial of the case was overwhelmingly in favor of enforcing Plaintiff's November 8, 2010 Mortgage and Note against the Defendant, The Estate of Conrad Hofmann, Drew Hofmann, executor.

6. The Trial Court erred as a matter of law in its finding that the deed dated January 25, 2012 was void.

Statement, 8/31/15.

2. Did the trial court err in relying on parol[] evidence to determine that the Mortgage securing the Note was unenforceable for the parties did not have a "meeting of the minds"[?]

3. As a matter of law, the incontrovertible evidence adduced through the trial of the case was overwhelmingly in favor of enforcing the [N&S] Mortgage and Note against the Appellee, The Estate of Conrad Hofmann, Drew Hofmann, executor.

4. As a matter of law, did the trial court exceed the scope of an *in rem* foreclosure proceeding by considering and opining on a Deed and power of attorney to assign stock in Keehof Bar[?]

Pl.'s Br. at 6 (footnote omitted).[17]

Upon appeal of a non-jury trial verdict, we consider the evidence in a light most favorable to the verdict winner and will reverse the trial court only if its findings of fact lack the support of competent evidence or its findings are premised on an error of law. ***Allegheny Cty. Hous. Auth. v. Johnson***, 908 A.2d 336, 340 (Pa. Super. 2006).

When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to

_____

[17] While N&S presents four questions for our review, its appellate brief is divided into five sections. The additional section is entitled, "The Trial Court Ignored the Provision of the Will to Allow Drew Hofmann as Executor to enter into the Note and Mortgage." ***See*** Appellant's Brief at 32-35. This argument apparently relates to the trial court's statement that the mortgage is invalid because Drew was precluded by protective provisions of the Will from entering into it. Because N&S did not raise that issue in its Statement of Questions Involved, ***see id.*** at 6, this issue is not before us. ***See Krebs v. United Refining Co.***, 893 A.2d 776, 797 (Pa. Super. 2006). However, as we discuss below, we conclude that this question is so closely related to other issues in the case that our remand will require reexamination of the trial court's holding with respect to it.

that party must be taken as true and all unfavorable inferences rejected. The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence.

*Hart v. Arnold*, 884 A.2d 316, 330–31 (Pa. Super. 2005) (internal quotation marks and citations omitted), *appeal denied*, 897 A.2d 458 (Pa. 2006). It is inappropriate for an appellate court to make factual determinations in the face of conflicting evidence. *Lanard & Axilbund, Inc. v. Muscara*, 575 A.2d 615, 619 (Pa. Super. 1990).

**The Trial Court's Holding
That the Note and Mortgage Are Unenforceable**

*Consideration and the Statute of Frauds*

N&S first challenges the trial court's conclusion that the mortgage and note were unenforceable because they were supported by past consideration. *See* Pl.'s Br. at 21-23. Of the $195,000 reflected by the mortgage note, $140,000 had allegedly been given by Nicholas of N&S to Defendant Conrad Sr. before Conrad Sr. died. The trial court stated that, "It is a general rule that past consideration is not sufficient to support a subsequent promise where the writing does not contain an express statement that the signer intends to be legally bound. . . . Th[e] past act of advancing $140,000.00, prior to the execution of the Mortgage, did not constitute consideration sufficient to create a binding contract." Tr. Ct. Op. at 11-12.

N&S argues that because the note contains the words "intending to be legally bound," it satisfied Pennsylvania's Uniform Written Obligations Act ("UWOA"), 33 P.S. § 6, part of what is commonly known as the "Statute of Frauds,"[18] and therefore did not require other consideration. As a result, N&S contends, the trial court erred in voiding the mortgage and note simply because a portion of the consideration described in the note had changed hands in the past. Pl.'s Br. at 21-23 (citing 33 P.S. § 6; *Hazelwood Lumber Co. v. Smallhoover*, 455 A.2d 108, 110 (Pa. 1982); and *Laudig v. Laudig*, 624 A.2d 651 (Pa. Super. 1993)). Like the trial court, Defendants claim that "under contract law" past consideration is inadequate to support a contract, but they cite no authority for this position. *See* Defs.' Br. at 11.[19]

---

[18] In Pennsylvania, the general "Statute of Frauds" encompasses a collection of statutes, some of which date back to the Commonwealth's colonial era, that are unofficially codified at 33 P.S. §§ 1-8 (Purdon). The UWOA was added to that collection in 1927, *see* Act No. 1927-475, P.L. 985 (May 13, 1927), and is unofficially codified at 33 P.S. §§ 6-8. The purpose of the UWOA is to allow a statement of an intent to be legally bound to function as the equivalent of a seal at common law. *Socko v. Mid-Atlantic Systems of CPA, Inc.*, 126 A.3d 1266, 1277 (Pa. 2015).

[19] Defendants also argue that N&S did not preserve this issue by including it in its Rule 1925(b) statement. Defs.' Br. at 12. Among the issues listed in N&S's Rule 1925(b) statement was that "The Trial Court erred by finding the Mortgage was unenforceable for a *lack* of consideration." Statement, 8/31/15 (emphasis added). While this broad language does not mention *past* consideration or the UWOA, it encompasses the arguments and rulings made during trial regarding the inadequacy of the consideration supporting the contract. We therefore decline to find that N&S has waived the question whether the trial court erred in finding that past consideration was insufficient to support the contract.

Section 1 of the UWOA, 33 P.S. § 6, reads in its entirety:

A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound.

Under this provision, if an agreement is accompanied by an intentional, binding statement, it does not require further consideration:

Our caselaw has explained that, generally, this section provides that a written agreement will not be deemed to be void for lack of consideration if it contains an express statement that the signer intends to be legally bound, *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 433 (2004), and, more explicitly, has interpreted this provision to supply the necessary consideration for an agreement. *See Morgan's* [*Home Equip. Corp. v. Martucci*], 136 A.2d [838,] at n. 12 [(Pa. 1957)] (parties' express intention to be legally bound within meaning of UWOA has the same effect in importing consideration as a seal on the agreement). . . . [A]ny party challenging the validity of a contract containing an express intent to be legally bound will not be entitled to relief from the agreement on the basis that the promises made therein lack consideration.

*Socko v. Mid-Atlantic Systems of CPA, Inc.*, 126 A.3d 1266, 1276-77 (Pa. 2015).[20] The UWOA applies to notes and mortgages, just as it does to

---

[20] *Socko* created an exception to the UWOA for restrictive covenants. *See* 126 A.3d at 1277-78. That exception is not relevent here. We also note that the UWOA does not apply to a *failure* of consideration — that is, where a contract contemplates the exchange of consideration, but a party fails to provide it. As we explained in *McGuire v. Schneider, Inc.*, 534 A.2d 115 (Pa. Super. 1987), *aff'd*, 548 A.2d 1223 (Pa. 1988):

A lack of consideration, if such existed, would not render [an] agreement a nullity, [if] the parties expressed therein their

*(Footnote Continued Next Page)*

other contract documents. *See, e.g.*, ***First Fed. Sav. & Loan Ass'n of Pittston v. Reggie***, 546 A.2d 62, 66–67 (Pa. Super. 1988) (applying UWOA, but holding that mortgage was unenforceable because it did not specify intent to be legally bound); ***Kronz v. Cech***, 175 B.R. 585, 593 (Bkrtcy. W.D. Pa. 1994) (holding requirements of UWOA satisfied by language in mortgage instrument).[21]

Here, the trial court declared that because the note and mortgage were supported primarily by consideration paid in the past, they were "unenforceable" for lack of valid consideration. Tr. Ct. Op. at 11-12.[22] The

---

*(Footnote Continued)* ———————————

> intent to be legally bound. Under the Uniform Written Obligations Act, 33 P.S. § 6, that statement of intent removes lack of consideration as a ground for avoiding the contract. ***Failure*** of consideration, on the other hand, goes to the heart of any claim based on an agreement and is always available as a defense to that claim. . . . [F]ailure of consideration does not contradict the terms of the instrument, but shows that the consideration contemplated was never received.

534 A.2d at 118-19 (citations omitted, emphasis added). The issue in this case is lack of consideration, not failure of consideration.

[21] Federal district court decisions offer this Court persuasive, but not binding, authority. ***NASDAQ OMX PHLX, Inc. v. PennMont Secs.***, 52 A.3d 296, 303 (Pa. Super. 2012).

[22] The court's emphasis on "past consideration" is problematic in several respects in addition to that discussed in the text. For one thing, the parties had not made an argument based on past consideration at trial. And while the court emphasized the importance of the "past consideration" in the case, it did not discuss the substantial portion of the consideration, $55,000, that indisputably was provided on the date the mortgage was executed. In addition, the court questioned whether the $140,000 had ever passed from

*(Footnote Continued Next Page)*

only authority the trial court cited to support that conclusion was the UWOA, 33 P.S. § 6. *See id.*[23] But although the UWOA explicitly states that a contract without consideration is valid and enforceable if its signer intends to be legally bound, the court, inexplicably, did not address whether the mortgage note contained the language that would make it valid and enforceable under the statute. In fact, the mortgage note contains the following language preceding Drew's signature:

> ***Intending to be legally bound***, the party hereto has affixed her [*sic*] hand and seal the day and year first above written. [Emphasis added.]

This language satisfies the UWOA, and it made the note and the mortgage that secures the note valid and binding. ***See Socko***, 126 A.3d at 1276. The trial court erred in overlooking this critical part of the contract and in holding the note and mortgage invalid and unenforceable as a result.

In addition to holding the mortgage invalid and unenforceable under the UWOA, the trial court also invoked an 1855 "supplement" to the Statute

_(Footnote Continued)_ ————————————

N&S to Defendants at all, noting that Drew "testified that he never received the $140,000.00," that the payment "was not substantiated by the evidence and testimony at trial," and that the evidence tended to show that the sum of $140,000 ***was not*** advanced to Conrad Hofmann." Trial Ct. Op. at 12 (emphasis in original). But that discussion had nothing to do with whether the note and mortgage were valid under the UWOA.

[23] Although our cases recognize that a contract based solely on past consideration may sometimes be unenforceable in equity, ***see Newman v. Sablosky***, 407 A.2d 448, 451 (Pa. Super. 1979) (citing cases), the court did not invoke that authority and it is inapposite here.

- 25 -

of Frauds of 1772, Act No. 1855-322, § 1, P.L. 308 (Apr. 26, 1855), 33 P.S. § 3,[24] to hold that N&S could not foreclose on the mortgage because the note was a contract to answer for the debt of another and was not fully contained in a writing that "disclose[d] the charged party's intention to be bound by the asserted contract." Tr. Ct. Op. at 15-16. Once again, however, the note explicitly **did** disclose the signer's intention to be bound, and to the extent it held otherwise, the court erred.[25]

The trial court suggested that Drew was without power to execute the note and mortgage because the spendthrift provision in Section VII of Conrad Sr.'s Will stated that "no interest in income or principal hereunder shall be subject or liable to" any pledge, debt, contract, or liability or "subject or liable to levy, attachment, execution, sequestration, or seizure." The court interpreted this provision to prohibit Drew from entering into the

_____

[24] This statute provides:

> No action shall be brought whereby to charge any executor or administrator, upon any promise to answer damages out of his own estate, or whereby to charge the defendant, upon any special promise, to answer for the debt or default of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him authorized.

33 P.S. § 3.

[25] We render no view on any other issue under the 1855 statute, and the trial court is free to reexamine that issue upon remand in light of our other holdings.

mortgage contract. Tr. Ct. Op. at 15. Drew signed the note three times — as executor of Conrad Sr.'s estate, in his personal capacity, and as president and sole shareholder of Keehof Bar. The trial court's discussion of Section VII pertained to Drew's authority to sign as executor, and if the trial court's interpretation of the Will were correct, then the validity of Drew's statement in the note that he intended to be legally bound by its terms might be in question — at least insofar as Drew signed as executor. Because the trial court overlooked Drew's statement that he intended to be bound, it will be necessary for the trial court to reconsider the question of Drew's authority to sign that statement in light of the terms of the Will. In this connection, we note that the trial court also appears to have overlooked Section VI.C. and D. of Conrad Sr.'s Will, which authorized Drew, as executor, to mortgage real property and to compromise claims. **See also** PEF Code, 20 Pa. C.S. § 3354 (discussing power to mortgage). The court therefore should reconsider this question on remand.

*Meeting of the Minds and the Parol Evidence Rule*

N&S also contends that the trial court erred in relying on parol evidence to determine that the note and mortgage were unenforceable because the parties did not have a "meeting of the minds." **See** Pl.'s Br. at 27-29. The trial court stated, "For a meeting of the minds to occur, the parties must mutually assent to the same contractual terms." Trial Ct. Op., 1/4/16, at 8 (citing **Mountain Props., Inc. v. Tyler Hill Realty Corp.**, 767

A.2d 1096, 110[1] (Pa. Super.), **appeal denied**, 782 A.2d 547 (Pa. 2001)). The court explained that it examined the ambiguous language in the note surrounding the $140,000 — "THE SUM OF $140,000 WAS ADVANCED DURING THE LIFETIME OF CONRAD HOFMANN . . . THE PARTIES AGREE THAT JOHN T. NICHOLAS ADVANCED $140,000.00 ON THE DATE OF THIS NOTE" — and considered the conflicting testimony about it that was given at trial. **Id.** at 8-11.[26] Based on the testimony, the trial court found that "the nature and extent of the parties' obligations was not certain," and "[t]he parties did not agree upon the essential terms in the Mortgage; thus, contractual formation never occurred." **Id.** at 8-9, 11. N&S insists, however, that because the essential language in the mortgage contract was clear, the trial court should not have strayed from its four corners when interpreting its meaning. Pl.'s Br. at 28 (citing, *inter alia*, **Goldsmith v. Means**, 158 A. 596, 599 (Pa. Super. 1932) ("[W]hen the intention of the parties can be clearly ascertained from the deed and the plan, parol evidence cannot be received to alter it")).[27]

_____

[26] Strothers testified that the $140,000 had been advanced to Drew for his recording studio; Drew testified that he never received the $140,000 and that he believed that he was "only on the hook for $5,000"; and Roberti testified that some of the $140,000 was used to make home mortgage payments for a house in New Jersey owned either by Conrad Sr. or Conrad Jr. Trial Ct. Op. at 9-11 (citing N.T. 88-89, 153-54, 33-35).

[27] Defendants argue that N&S waived the claim that the trial court improperly considered parol evidence by failing to raise that issue during
*(Footnote Continued Next Page)*

We agree that the trial court erred. First, this is an action by N&S to foreclose on the mortgage securing the note. Although the trial court focused on an ambiguous term that it found in the note, it did not assert that any provision of the mortgage itself is ambiguous. Nor could it. The mortgage clearly provides that the estate executed a $195,000 note and that it "grants and conveys" the Cambria Street property as security for payment of the note. Mortgage, Ex. P-4. The obligation under the mortgage document is clear.

The trial court held, however, that there was no "meeting of the minds" regarding the mortgage debt set forth in the note itself. In doing so, the court misunderstood the role of a "meeting of the minds" in contract formation. Because a court is constrained to construe the parties' contract based on the parties' outward and objective actions — particularly, the plain terms of their written agreement — a subjective, or "true and actual,"

*(Footnote Continued)* _____

trial or in its Rule 1925(b) Statement. Appellees' Br. at 12-13. We disagree. When ruling from the bench, the court stated, "Anybody knows fundamental contract law is a meeting of the minds, and there has to be a clear understanding and intention of the parties." N.T. at 210-11. The trial court did not make entirely clear that it was basing its decision on the parol evidence presented at trial. N&S' subsequent Rule 1925(b) Statement stated that "[t]he Trial Court erred in finding that the Mortgage was unenforceable as the parties did not have a meeting of the minds." Although N&S did not use the words "parol evidence," the issue stated by N&S sufficiently challenged the trial court's conclusion that there was no meeting of the minds and necessarily implicated any error in the legal analysis employed by the trial court in so concluding. Moreover, we hold that the primary error by the trial court was not in its use of parol evidence, but in its conclusion that the contract was unenforceable.

meeting of the minds is not necessary for an enforceable contract to form. *Long v. Brown*, 582 A.2d 359, 363 (Pa. Super. 1990); *see also Krizovensky v. Krizovensky*, 624 A.2d 638, 643 (Pa. Super.) ("where the parties' agreement has been reduced to a writing, the actual intent of the parties is not relevant unless it has been expressed in the writing"), *appeal denied*, 637 A.2d 287 (Pa. 1993). "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990) (citation omitted). "Once a person enters into a written agreement[,] he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing." *Id.* at 165-66 (quoting *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co.*, 229 A.2d 741, 742 (Pa. 1967)). It should not "be assumed that the parties were ignorant of the meaning of the language employed." *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982).

Thus, when faced with determining whether the parties mutually assented to the contract, the trial court should have heeded the following —

> The principles that guide this inquiry are well-settled. The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. . . . When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of

whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.

*Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co*., 905 A.2d 462, 468–69 (Pa. 2006) (citations omitted).

Whether a contract contains ambiguous terms is a question of law. *Walton v. Philadelphia Nat. Bank.*, 545 A.2d 1383, 1388 (Pa. Super. 1988). "To determine whether there is an ambiguity, it is proper for a court to hear evidence from both parties and then decide whether there are objective indications that the terms of the contract are subject to differing meanings." *Krizovensky*, 624 A.2d at 643. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Ins. Adjustment*, 905 A.2d at 469. The fact that the parties do not agree upon a proper interpretation does not necessarily render a contract ambiguous. *Krizovensky*, 624 A.2d at 642.

Here, the trial court found that the mortgage note contains an ambiguity: the language stating "THE SUM OF $140,000 WAS ADVANCED DURING THE LIFETIME OF CONRAD HOFMANN," clearly conflicts with the statement a few lines later that, "THE PARTIES AGREE THAT JOHN T. NICHOLAS ADVANCED $140,000.00 ON THE DATE OF THIS NOTE." Because these provisions cannot be read as consistent with one another, we agree that they are ambiguous and that the trial court was free to use parol evidence to "resolve the ambiguity." *Ins. Adjustment*, 905 A.2d at 468–69.

But that is not what the trial court did. Rather, after having identified this ambiguity within the language of the note, the court surveyed testimony by various parties to the contract and its drafting (Drew, Strothers, and Roberti) to certify that the parties did not agree on what the ambiguous terms meant. **See** Tr. Ct. Op. at 9-11.[28] And then, having failed to resolve the ambiguity, the court declared that the "[t]he inconsistency and ambiguity . . . demonstrates the lack of mutual assent between the parties" and that "the nature and extent of the parties' obligations was not certain." **Id.** at 11. Thus, the court used an ambiguity in the contract that it failed to resolve as a tool to declare the mortgage unenforceable. **See id.**

The trial court had no license to invalidate the mortgage in this way. "While an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning, **In re Friese's Estate**, 9 A.2d 401, 403 (Pa. 1939), "not every term of a contract must always be stated in complete detail." **Helpin v. Trustees of Univ. of Pennsylvania**, 969 A.2d 601, 610–11 (Pa. Super. 2009), **aff'd**, 10 A.3d 267 (Pa. 2010). Where an essential term is missing or not clearly expressed, "the court may infer the parties' intent from other evidence and impose a term consistent with it." **Id.** Here, however, the ambiguity on which the trial court focused did not

_____

[28] Strothers testified that the $140,000 consisted of past loans, particularly to Drew. Drew said he had no understanding about the $140,000 and thought he was "signing for $5,000" and no more. And Roberti thought that the money had gone either to Conrad Sr. or Conrad Jr. Tr. Ct. Op. at 9-11.

pertain to an essential term of the note or mortgage. Rather, it related only to whether $140,000 of the $195,000 mortgage debt was advanced prior to or at the time of execution of the mortgage. Resolution of that question was not necessary to determine that the note obligated its signers to repay the $195,000 debt recited in it,[29] or that the Cambria Street property stood as security for that payment and was subject to foreclosure if the payment was not made. The amount of the debt, due date, and property description were clearly stated in the documents. Therefore, the ambiguity regarding the $140,000 did not make the note and mortgage too indefinite to be binding. *See In re Berry*, 11 B.R. 886, 891 (Bankr. W.D. Pa. 1981) (signed mortgage has "the indications of validity" where it "clearly states that it is a mortgage and describes the real property in detail"); *cf. also GMH Assocs., Inc. v. Prudential Realty Grp.*, 752 A.2d 889, 900 (Pa. Super. 2000) ("The essential terms that must be identified and agreed to in order to form a valid contract for the sale of real estate are the naming of the specific parties, property and consideration or purchase price").

---

[29] Although Drew testified that he thought he was "only on the hook for $5,000," N.T. 7/13/15, at 153-54, the plain language of the note made clear that the debt was $195,000, not $5,000. Any understanding of Drew that contradicted the note's plain language on this issue is immaterial. *See Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1339 (Pa. Super. 1997) ("[The Superior Court] will not rewrite the contract or give it a construction that conflicts with the plain, ordinary and accepted meaning of the words used").

The trial court's error was two-fold. First, it failed to recognize that the parties agreed to the material, essential terms so that a contract was formed, and that the only term lacking clarity was the non-critical detail of when the $140,000 was advanced. Second, with respect to this ambiguous element, the court failed to resolve the ambiguity in such a way as to give effect to the parties' intentions.[30] For present purposes, it is the first of these errors that controls our disposition. Because the trial court held the note and mortgage invalid on the basis of this error of law, its decisions on these issues cannot stand. **See Allegheny Cty. Hous. Auth.**, 908 A.2d at 340.

*Vacatur*

Because we hold that the trial court erred in both of its holdings regarding lack of consideration and "meeting of the minds," we will vacate the judgment in favor of Defendants on the mortgage foreclosure issues. Because that judgment was entered after a non-jury trial, we will remand this matter to the trial court to consider its other rulings on the mortgage

---

[30] We need not resolve this second issue. However, we note that the testimony of Roberti and Strothers indicated that the second clause (stating that $140,000 was advanced on the date of the note) was a mistake, as they explained to the trial court that the $140,000 was given by John T. Nicholas during the lifetime of Conrad Sr., and not on the date that the mortgage was executed. **See** N.T., 7/13/15, at 32-26, 41, 43-44, 73-74, 76, 88-89, 91. This reading comports well with the rest of the plain language in the mortgage note, which describes how at least part of that money had been spent (for example, to finance a music studio, make home mortgage payments, and pay the operating costs of Keehof Bar).

foreclosure afresh in light of these holdings. Due to our disposition, we will not address the other issues that N&S presents, but instead leave those issues for reconsideration on remand. **See Weaver v. Martin**, 655 A.2d 180, 182 n.1 (Pa. Super. 1995).

### The Trial Court's Holding
### That the Deed Given to N&S by Conrad Jr. Is Invalid

In N&S's final issue, it complains that the trial court exceeded the scope of an *in rem* foreclosure proceeding by deciding Defendants' counterclaim to quiet title in their favor and declaring the deed given to N&S by Conrad Jr. to be invalid and void. Pl.'s Br. at 35-39.[31] N&S claims that the rules governing mortgage foreclosure, Pa.R.Civ.P. 1141 *et seq*., do not permit counterclaims unless they arise "from the same transaction from which the plaintiff's cause of action arose." Pl.'s Br. at 35 (quoting **Green Tree Consumer Disc. Co. v. Newton**, 909 A.2d 811, 814 (Pa. Super. 2006)). Therefore, according to N&S, any determinations made by the trial court aside from whether the mortgage was in default, such as voiding the

---

[31] In its brief, N&S frames this final issue as: "As a matter of law, did the trial court exceed the scope of an *in rem* foreclosure proceeding by considering and opining on a Deed and power of attorney to assign stock in Keehof Bar." Pl.'s Br. at 6. However, the argument presented by N&S in its brief does not address Keehof Bar or the power to assign its stock, and therefore the latter portion of N&S' question is waived. **See Purple Orchid, Inc. v. Pennsylvania State Police**, 813 A.2d 801, 804 (Pa. 2002) (issues not addressed or developed in an appellate brief are waived).

January 25, 2012 deed or quieting title in favor of Defendants, were outside the proper scope of the mortgage foreclosure proceeding. *Id.* at 36.

Defendants do not respond specifically to N&S' challenge to the scope of the trial court's rulings. Instead, Defendants argue that N&S admitted at trial that the deed was void *ab initio*. Appellee's Br. at 16. Our review of the record discloses that when Defendants introduced the deed during trial to show that N&S already had title to the property under mortgage, N&S objected on grounds of relevance, stating that both parties had agreed that the deed was void *ab initio*. N.T. at 16-17. It is this statement on which Defendants rely. However, other than citing this statement, Defendants make no legal argument and cite no authority in opposition to N&S' position on this issue. If Defendants' argument is that N&S' statement amounts to a judicial admission (and it is unclear if this is what Defendants posit), we note that judicial admissions apply only to disputed facts, and are "exclusive of legal theories and conclusions of law," such as the validity of a legal document. ***John B. Conomos, Inc. v. Sun Co., Inc. (R&M)***, 831 A.2d 696, 713 (Pa. Super. 2003), ***appeal denied***, 845 A.2d 818 (Pa. 2004). In fact, our review of the record suggests to us that throughout the pleadings both parties have argued both for and against the validity of the deed. ***See*** Am. Compl., 4/11/14, ¶ 9; Am. Compl., 6/9/14, ¶¶ 10-13.; Prelim. Objs., 12/23/13, ¶ 5; Answer, 12/26/14, ¶¶ 10, 34-35, 40-41. We therefore decline to resolve this issue on this basis.

The trial court's Rule 1925(a) opinion justifies its voiding of the deed for two reasons: (1) the deed conveyed a greater share of the property than Conrad Jr. was expecting to inherit,[32] and (2) Conrad Jr. had not yet inherited the property.[33] Trial Ct. Op., 1/4/16, 16-17. The court did not address whether its ruling on these issues exceeded the proper scope of a mortgage foreclosure action under the procedural rules.

The Rules of Civil Procedure governing foreclosure actions were drafted by our Supreme Court and adopted in 1949, but they have a statutory basis dating back to 1705. *See* Kenneth E. Gray, *Definition; Conformity to Civil Action*, *in* 15 West's Pennsylvania Practice, § 2:1 (Thomson Reuters, 3d ed., Dec. 2016 Update). Thus, despite its current embodiment in the Rules, the procedure in connection with the foreclosure of mortgages has been held to be "purely statutory," so that its requirements must be stringently followed. ***Peoples Nat'l Bank of Lebanon v. Noble***, 487 A.2d 912, 915 (Pa. Super. 1985).

Mortgage foreclosure in Pennsylvania is strictly an *in rem* or "*de terris*" proceeding. Its purpose is solely to effect a judicial sale of the mortgaged property. ***U.S. Bank, N.A. v. Pautenis***, 118 A.3d 386, 394 (Pa. Super.

---

[32] The deed stated that Conrad Jr. was selling his 50% interest in the property to N&S, but the Will of Conrad Sr. devised only a 49% interest in the real property to his namesake. Trial Ct. Op. at 16-17.

[33] Conrad Sr.'s Will was still in probate when Conrad Jr. executed the deed selling his interest in the property to N&S for $5,000. Trial Ct. Op. at 17.

2015). The holder of a mortgage note can decide whether to file a foreclosure action or to file an *in personam* assumpsit action on the note, but the actions are not usually combined. ***Levitt v. Patrick***, 976 A.2d 581, 591 (Pa. Super. 2009); ***accord US Bank N.A. v. Mallory***, 982 A.2d 986, 992 n.3 (Pa. Super. 2009).[34]

Rule of Civil Procedure 1148, which governs which counterclaims are permissible in a mortgage foreclosure action, states:

> A defendant may plead a counterclaim which arises from the same transaction or occurrence or series of transactions or occurrences from which the plaintiff's cause of action arose.

We have held that this rule is to be interpreted narrowly, and only counterclaims that are "part of or incident to the creation of the mortgage relationship itself" are to be permitted. ***Cunningham v. McWilliams***, 714 A.2d 1054, 1057 (Pa. Super. 1998), ***appeal denied***, 734 A.2d 861 (Pa. 1999). Therefore, Rule 1148 "does not permit a counterclaim arising from a contract related to the mortgage, such as a contract for sale of real property." ***Id.***; ***accord Green Tree***, 909 A.2d at 814. Nor does it permit

_____

[34] Some exceptions exist. "[J]udgment in the mortgage foreclosure can be both *in rem* and *in personam*, provided that the mortgagor waives any objection to the inclusion of the assumpsit action for a personal judgment in the mortgage foreclosure proceeding." ***Insilco Corp. v. Rayburn***, 543 A.2d 120, 123 (Pa. Super. 1988). Also, a lender may petition the court to fix fair market value of real property following sale in a mortgage foreclosure execution proceeding, as mandated by the Deficiency Judgments Act. ***Home Sav. & Loan Co. of Youngstown, Ohio v. Irongate Ventures, LLC***, 19 A.3d 1074, 1079 (Pa. Super.), ***appeal denied***, 27 A.3d 225 (Pa. 2011).

counterclaims where the facts giving rise to the counterclaims occur after the creation of the mortgage and after the mortgagors were in default. ***First Wisconsin Trust Co. v. Strausser***, 653 A.2d 688, 695 (Pa. Super. 1995).

"Thus, in Pennsylvania, the scope of a foreclosure action is limited to the subject of the foreclosure, *i.e.*, disposition of property subject to any affirmative defenses to foreclosure or counterclaims arising from the execution of the instrument(s) memorializing the debt and the security interest in the mortgaged property." ***Rearick v. Elderton State Bank***, 97 A.3d 374, 383 (Pa. Super. 2014). While Rule 1148 does not govern affirmative defenses listed as New Matter, such defenses must be more than a restatement or continuation of an impermissible counterclaim. ***Chrysler First Bus. Credit Corp. v. Gourniak***, 601 A.2d 338, 342 (Pa. Super. 1992).

In contrast to a mortgage foreclosure action, an action to quiet title is generally brought by a possessor of land against another who has some claim or interest in the land. Pa.R.Civ.P. 1061(b). An action brought pursuant to Civil Rule 1061(b)(3) is aimed "to compel an adverse party to file, record, cancel, surrender or satisfy of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land." A resolution in favor of the plaintiff bars the defendant forever from "asserting any right, lien, title or interest in the land inconsistent with the interest or claim of the plaintiff set forth in the

complaint. . . ." Pa.R.Civ.P. 1066(b)(1). Because of the strict rules governing mortgage foreclosure, an action to quiet title is permissibly joined to a foreclosure action only where the action to quiet title is based on the validity of the mortgage itself. **See, e.g.**, **Meara v. Hewitt**, 314 A.2d 263, 264 (Pa. 1974).

Here, N&S filed to foreclose on a mortgage.[35] Defendants filed a counterclaim to quiet title that raised, among other concerns, the validity of the January 25, 2012 deed. Trial Ct. Op. at 2; Answer to Second Amended Complaint with Counterclaim to Quiet Title and Affirmative Defenses. The counterclaim cited Pa.R.C.P. 1061(b)(3). **Id.** The trial court ruled that both the mortgage and deed were void, and quieted title in favor of Defendants.[36]

We agree with N&S that the trial court erred in considering the validity of the deed and quieting title to the property. The trial court was tasked only with determining whether the foreclosure action would lie, and, if so, effecting a judicial sale of the foreclosed property. **Pautenis**, 118 A.3d at

---

[35] Defendants do not allege on appeal that this is not an *in rem* mortgage foreclosure action; also, during the trial, Defendants themselves argued that this action was limited to an *in rem* mortgage foreclosure, N.T. 147, 203.

[36] The second paragraph of the trial court's July 14, 2015 order declares the mortgage void and canceled; the fifth paragraph of the order declares that the deed dated January 25, 2012, is void and canceled; the sixth paragraph quiets title in favor of Defendants; the seventh paragraph declares Defendants Drew M. Hofmann and Conrad G. Hofmann as the "legal owners" of the property; and the third and sixth paragraphs both bar N&S and N&S' successors and assigns forever from asserting any right, lien, mortgage, title, or interest in the property. Order, 7/14/15.

394. Any permissible counterclaim by Defendants to quiet title must have been based upon the mortgage documents and their execution, not a subsequent deed. **Rearick**, 97 A.3d at 383. The January 25, 2012 deed was executed over a year after creation of the mortgage; it does not involve the same parties as the mortgage, does not mention the mortgage, and does not affect the legitimacy of the mortgage. Therefore, the deed could in no way be considered "part of or incident to the creation of the mortgage relationship itself." **Cunningham**, 714 A.2d at 1057. We therefore hold that the trial court erred in opining on the validity of the January 25, 2012 deed, and in quieting title.

We recognize that the trial court's grounds for voiding the deed pertain to flaws in that document that may seem obvious — so much so that at one or more points in these proceedings they were acknowledged by N&S. Declining to permit the trial court to address these flaws in this proceeding under these circumstances therefore may seem wasteful and inefficient. But the Rules of Procedure are clear, and N&S properly preserved its objection under the rules throughout this case. We therefore are constrained to vacate the trial court's decision regarding the deed and title.

Because the trial court misconstrued the law, we vacate the judgment below, vacate the order denying N&S's post-trial motion, and remand for further proceedings.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/24/2017