J-A18018-18

2018 PA Super 243

| | | |
|---|---|---|
| GEORGE D. MEDLOCK, JR. AND ALICIA MEDLOCK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHILMARK HOME INSPECTIONS, LLC, MICHAEL MCKINNEY, AND MATTHEW BROWN, | : | No. 3596 EDA 2017 |
| | : | |
| v. | : | |
| | : | |
| GLENN S. GITOMER, JANE E. GITOMER, AND LONG & FOSTER REAL ESTATE, INC., | : | |

Appeal from the Judgment Entered November 17, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  03145 July Term, 2015

BEFORE:   STABILE, J., STEVENS*, P.J.E., and STRASSBURGER**, J.

OPINION BY STEVENS, P.J.E.:                    **FILED AUGUST 31, 2018**

Appellants, Chilmark Home Inspections, LLC, Michael McKinney, and

Matthew Brown, appeal from the judgment entered in the Court of Common

Pleas of Philadelphia County following a non-jury trial and verdict in favor of

Glenn S. Gitomer and Jane E. Gitomer, husband and wife ("the Gitomers").[1]

_____

[1] We note Appellants filed an appeal from the order denying post–trial motions. An appeal does not properly lie from an order denying post-trial motions. **See Johnston the Florist, Inc., v. TEDCO Const. Corp.**, 657 A.2d 511, 514 (Pa.Super. 1995) (*en banc*). This Court directed Appellants to

_____
*   Former Justice specially assigned to the Superior Court.
** Retired Senior Judge assigned to the Superior Court.

After a careful review, we affirm.

The relevant facts and procedural history are as follows: George D. Medlock, Jr., and Alicia Medlock, husband and wife ("the Medlocks"), entered into an agreement of sale with the Gitomers to buy the Gitomers' home. The agreement of sale included a home inspection contingency clause, and the Medlocks retained Chilmark Home Inspections, LLC ("Chilmark") to conduct a home inspection. On August 8, 2014, Michael McKinney, an employee of Chilmark, conducted the home inspection, and on October 2, 2014, settlement occurred on the property. Thereafter, the Medlocks moved into the home.

Subsequently, the Medlocks filed a complaint[2] against Chilmark, Mr. McKinney, and Matthew Brown, who was the owner of Chilmark (collectively "the Chilmark parties"), averring that "[i]n reliance on the representations and statements contained in the [home inspection] report, [the Medlocks] did not require the home seller to make any repairs or perform any investigations of the conditions…as was their right pursuant to the agreement of sale."

_____

praecipe the trial court's Prothonotary to enter judgment and file a certified copy of the trial court docket reflecting the entry of judgment with this Court. Appellants complied, and judgment was entered on November 17, 2017. Thus, we shall treat the notice of appeal previously filed as filed after the entry of judgment. *See* Pa.R.A.P. 905(a).

[2] The Medlocks initially filed a complaint on August 21, 2015; however, they filed an amended complaint on October 16, 2015. The amended complaint was substantially similar to the initial complaint except that the amended complaint contained allegations to "pierce the corporate veil" to bring claims against Mr. Brown, the owner of Chilmark, personally.

Medlocks' Amended Complaint, filed 10/16/15, at 3. Further, they averred they "were moving to the area from out of state and accordingly relied upon the inspection to provide notice and information about material conditions of the property." *Id.*

The Medlocks averred that, after living in the home for seven months, they discovered a brown water stain forming around one of the recessed lights in the finished basement, which sits below a tiled patio. In an effort to discover the source of the leak, Mr. Medlock removed a readily accessible panel located in the basement wall, and he discovered "large sections of wet, rotten wood that could be viewed from the readily openable access panel on the floor directly behind the panel." *Id.* at 4. The Medlocks averred the wet, rotten wood was from a support beam, the beam was darkened from water penetration, and there "were several large gaps from missing wood in the support beam that were viewable from the readily openable access panel[.]" *Id.* Moreover, the Medlocks averred there was evidence of mold in the wall directly behind the access panel, and the insulation behind the access panel was wet to the touch. *Id.* The Medlocks posited "[t]he conditions existing behind the readily openable access panel evidenced a water infiltration problem which was, or which should have been, ascertainable upon a reasonable inspection by [Mr. McKinney]." *Id.*

The Medlocks contended Mr. McKinney identified a stain next to the readily openable access panel, but he failed to open the panel as part of the

inspection. Accordingly, the inspection report did not include the damage, which was readily observed once the access panel was opened. Thus, the extent of the damage to the basement was neither identified nor referred for repair prior to the Medlocks' purchase of the home.

On July 18, 2015, the Medlocks sent a letter via certified mail to Chilmark, in care of Mr. McKinney, requesting that their insurance carrier be put on notice of a claim. The Medlocks followed up with emails, and subsequent to one of the emails, on September 24, 2015, Mr. Brown responded that he did not have insurance to cover the Medlocks' claim because he failed to follow the requirements of his policy. Specifically, Mr. Brown responded that, because he failed to provide a written agreement to the Medlocks to perform the inspection services, his insurance carrier indicated it would deny coverage for a claim.

Based on the aforementioned, the Medlocks raised against the Chilmark parties a violation of the PA Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), negligence, a breach of contract, and negligent misrepresentation.

The Chilmark parties filed an answer to the Medlocks' complaint, and on July 8, 2016, they filed a joinder complaint seeking to join the Gitomers as well as Long & Foster Real Estate, Inc. ("the real estate company"), for which Mrs. Gitomer worked as a real estate agent. Specifically, the Chilmark parties alleged the Medlocks purchased the subject property from the Gitomers, and

during the transaction, Mrs. Gitomer acted in a dual capacity: as both seller and seller's agent. Further, the Chilmark parties averred the Gitomers purposefully concealed the rot and water damage at issue, as well as failed to disclose such information in the seller's property disclosure statement. The Chilmark parties also averred the Gitomers failed to disclose in the seller's disclosure statement that they had remodeled the basement during their ownership and this omission was a proximate cause of the Medlocks' damages.

Accordingly, the Chilmark parties sought contribution and indemnification. Moreover, indicating the Medlocks had resolved their claims against the Chilmark parties and had expressly assigned their rights to them, the Chilmark parties raised, as the Medlocks' assignee, claims against the Gitomers and the real estate company, including negligent misrepresentation, violation of the Pennsylvania Real Estate Seller Disclosure Law ("RESDL"), and violation of the UTPCPL.

The Gitomers filed preliminary objections, which the trial court denied,[3] as well as an answer with new matter and a cross-claim. In the cross-claim, the Gitomers averred the Chilmark parties were solely liable to the Medlocks.

---

[3] The Gitomers alleged in the trial court that the Chilmark parties were not permitted to "stand in the shoes" of the Medlocks since claims under the RESDL are reserved for buyers. They continue to present such a claim in their appellee brief. However, as discussed *infra*, we affirm the judgment entered in favor of the Gitomers on different grounds, and therefore, we need not address this issue.

On August 21, 2017, the matter proceeded to a bench trial at which the parties informed the trial court that the real estate company settled with the Chilmark parties prior to trial, and Mrs. Gitomer was released from liability as an agent, but not in her individual capacity. N.T., 8/21/17, at 8-9. The Chilmark parties reiterated that the Medlocks settled their claims against the Chilmark parties and expressly assigned their rights to the Chilmark parties. Accordingly, at trial, the Chilmark parties proceeded as "the plaintiffs" with the Gitomers as "the defendants."

Mr. Medlock testified that, in connection with the purchase of the home, the Medlocks received a seller's disclosure statement from the Gitomers. *Id.* at 22. Mr. Medlock explained he understood the form to require the sellers to inform the buyers of "anything that is wrong with the property," and the Medlocks relied upon the information provided in the form. *Id.* at 22-23. Mr. Medlock testified the Gitomers did not include in the seller's disclosure statment that there had been any additions or alterations done to the rear basement. *Id.* at 23. Mr. Medlock confirmed Chilmark performed an inspection of the home prior to the Medlocks' purchase thereof. *Id.*

Mr. Medlock testified he moved into the house in late 2014, and five or six months later, he noticed a brown water stain around a light in the basement ceiling. *Id.* at 24. The Medlocks called "a number of companies to try [to] figure out what [was] going on." *Id.* at 25. After a number of recommendations about what might be causing the brown stain, Mr. Medlock

"ended up opening the access panel and saw the extensive damage behind the access panel, and that's when [the Medlocks] went through the process of contacting Chilmark[.]" *Id.* Mr. Medlock testified the damage included insulation completely soaked in water, and chunks of wet, rotting wood from a support beam. *Id.* at 26.

The Medlocks hired a contractor to remove the drywall where the access panel was located, and upon removing the drywall, the contractor discovered additional rotten wood. *Id.* at 29. Mr. Medlock confirmed some of the rotten wood was not discovered until the contractor removed the drywall. *Id.* The contractor removed all of the drywall in the basement to determine the extent of the water damage. *Id.* Mr. Medlock noted the wall containing the access panel had "newer looking studs that framed that wall" as compared to the rest of the walls in the basement. *Id.* at 34. He also noted it appeared as if someone put up a frame to support the rotten beams, and there was new wood and drywall attached to the rotten beams. *Id.* The drywall, which was attached to the rotten beams, contained a stamp indicating "Made in the U.S.A.-December 14, 2003." *Id.* at 36.

Mr. Medlock testified he paid $76,000.00 for necessary renovations. *Id.* at 42. Further, the following relevant exchange occurred:

> **Q:** Mr. Medlock, if you had known at the time that you were purchasing the home that there had been prior work done to that rear basement wall—I'm sorry, the rear basement room without a permit, would that have impacted your purchase on this at all?
>
> **A:** We would not have purchased the property.

**Q:** Why not?

**A:** We had seen several properties that we liked that had issues. Some had needed work. We didn't want a place that needed work. With this, with the permits, I watch home shows, and I know if you have something that is unpermitted, they can come in and tell you that you need to redo the entire room. We didn't want to deal with that.

*Id.* at 46.

On cross-examination, Mr. Medlock admitted that, if he or the home inspector had opened the access panel, the damage would have been readily observable prior to purchase. *Id.* at 48. He admitted that, in the seller's disclosure statement, the Gitomers checked "yes" next to the question: "Are you aware of any water leakage accumulation or dampness within the basement or crawl space?" *Id.* at 52. They also checked "yes" next to the question: "Do you know of any repairs or other attempts to control any water or dampness problems in the basement or crawl space?" *Id.*

He also admitted the summary of the inspection report from Chilmark relevantly revealed the tiled patio, which was attached to the house on the water damaged basement wall, "has settled and cracked" and "[m]ay require replacement." *Id.* at 67. The inspection report also indicated "[s]ealing the cracks is recommended to reduce water pressure[,]" and it noted "[t]he basement shows evidence of moisture penetration." *Id.* at 64-65. Also, the inspection report included a photo of a stain, which was located on the wall next to the access panel in the basement. *Id.* at 71. Moreover, the inspection report indicated there was a water stain noted in the dining room and "[t]his

is suspected to be the result of prior leakage from the patio[.]" *Id.* at 68. Further, the inspection report noted "[t]he French door and the first floor rear wall is essentially rotted." *Id.* at 66. Mr. Medlock admitted that, to the best of his knowledge, a Chilmark employee did not open the access panel as part of the home inspection, and had they done so "they would have seen what was going on in the walls[.]" *Id.* at 58.

Joseph Graci, who testified as an expert in the field of civil and structural engineering, indicated that, on October 24, 2015, he conducted a structural assessment of the patio in the rear part of the subject house and the wood joists that support the patio. *Id.* at 83. He opined years of water infiltration rotted the original support beams and new wood was then installed next to the old beams to add strength. *Id.* at 83-86. Mr. Graci indicated there was no record that a permit was issued to refinish the basement or install the new beams. *Id.* at 88-89.

Mr. Graci opined that "the root cause of the damage to the wood members was the long term leaking of the [patio,]" and the support beams were no longer structurally sound. *Id.* at 89. He testified:

> [N]othing was done to mitigate that damage, so if those joists were damaged, and they appeared to have been damaged at the time that the room was finished, that some structural mediation should have occurred. So they should have assisted the joists, removed the rotted joists, they should have done something to make sure that when they put [the] ceiling on, that they made sure that the system was structurally sound to support the weight. Had they [done] that with a permit, and an engineer who prepared plans for that, they would have been led down that path. They [*sic*] since they avoided the permit process, they [*sic*]

was never any inspection there by an engineer and by the township, to my knowledge.

*Id.* at 90-91.

Mr. Graci opined the presence of the new wood attached to the old, rotten wood suggested that someone knew "they needed some help, but they didn't complete it properly, and they didn't have anybody,…that would have the expertise and the legal right to be able to make a determination that the wood was either structurally sound or structurally not sound." *Id.* at 91-92. Mr. Graci indicated that only a professional engineer is allowed by the Commonwealth of Pennsylvania to make a structural determination. *Id.* at 92.

On cross-examination, Mr. Graci testified he found no evidence of any permits issued in 2003 or 2004 relative to the alterations made to the basement. *Id.* at 95-96. However, upon further questioning, he admitted that records from the Township revealed that an electrical permit was issued to the Gitomers in 2004. *Id.* He opined that, in order to finish the basement in the manner apparently done by the Gitomers, a building permit would have been required. *Id.* at 97. Mr. Graci admitted that it appeared the work in the basement was done by a contractor, and thus, he had no personal knowledge as to whether the Gitomers were aware of the water problem at the time improvements were made to the basement. *Id.* at 104-05.

On cross-examination,[4] Jane E. Gitomer testified the Gitomers moved into the house in November of 1989, and in 2004, they had work done to the basement. *Id.* at 110. Although she could not recall the name of the contractor, she remembered that the contractor installed new drywall, a heating system, carpet, lights, French doors, and a ceiling. *Id.* at 111. The work lasted between four to six weeks, and Mrs. Gitomer admitted she could not find any paperwork indicating the contractor had secured a building permit for the work. *Id.* Mrs. Gitomer admitted the Gitomers failed to disclose on the seller's disclosure property form that a contractor had made alterations to the basement in 2004. *Id.* at 116-17, 119.

Mrs. Gitomer denied observing any leaking into the basement ceiling from the tiled patio. *Id.* at 113-14. Thus, Mrs. Gitomer testified that, since the Gitomers did not experience water leakage from the tiled patio into the room, they did not disclose anything in this regard in the seller's disclosure statement. *Id.* at 114. Further, Mrs. Gitomer denied that the contractor, who placed the new wood next to the rotting support beams, told the Gitomers about the rotting beams, and she was not aware that new wood was being placed next to rotting wood for structural support. *Id.* at 117. Mrs. Gitomer testified that she never discussed permits with her contractor, and she

---

[4] The parties agreed that the Chilmark parties would call the Gitomers to the stand as if on cross-examination, and the Gitomers would then be questioned by their attorney as if on direct examination.

- 11 -

assumed that, if a building permit was necessary, the contractor would have secured one. *Id.* at 118, 122.

On direct examination, Mrs. Gitomer testified that, as of 2004, she had not contemplated selling the home. *Id.* at 120. However, in 2014, the Gitomers decided to sell the house in order to move into a smaller home. *Id.* at 121. She explained that the reason she was unable to find paperwork relative to permits for the basement was related to the fact she discarded most of her paper records when she and her husband moved into the smaller home. *Id.* She testified that, if a building permit was required for the basement renovation, the contractor would have secured it without discussing it with her. *Id.* at 122. She acknowledged a contractor performed work in the basement in 2004, and the Township's records reveal the contractor secured an electrical permit, but not a building permit. *Id.* at 123. Further, the Township's records reveal "an inspector came out to inspect the work that was done[]" in the basement. *Id.*

She testified she did not disclose in the seller's disclosure statement that work had been done in the basement because she considered the work to be "cosmetic." *Id.* at 126, 130. She denied attempting to conceal any water damage in the basement, and she testified that, if the contractor in 2004 would have told her about the damage, she would have ensured it was fixed. *Id.* at 127. She noted that she entertained on the patio and her children spent time in the basement, none of which would have occurred if Mrs.

Gitomer knew about the rotting wood.  *Id.* at 124.  She also testified that, in 2011, she had the patio tiled, and the contractor never informed her that he saw any evidence of water intrusion.  *Id.* at 128.

On cross-examination, Glenn S. Gitomer acknowledged the Gitomers made changes to the basement in 2004.  He remembered the room existed when the Gitomers purchased the house, and in 2004, they decided to add drywall to three of the walls, recessed lighting, and a new heating system. *Id.* at 134-35.  He testified that, during the construction, he did not go into the room, and the contractor, whose name he could not recall, did not inform him of any water problem or rotting wood.  *Id.* at 136, 139.

With regard to permits, he testified the Gitomers relied on the expertise of their contractors to secure the necessary permits.  *Id.* at 136.  He recalled that the contractor received some type of permit for the basement work in 2004, and "the work was inspected by Lower Merion Township."  *Id.*  He noted he was unaware of any other permits being required for the basement work and, if additional permits were required, he assumed the contractor would have secured them.  *Id.* at 137.

On direct examination, Mr. Gitomer denied observing any water intrusion into the home from the patio.  *Id.* at 142.  He further denied seeing any type of damaged wood or rotten wood in or around the patio.  *Id.* at 143.

Alesio Panaccio, a general contractor, testified that, in 2011, on the patio at the subject house, he replaced the stamped concrete with tile.  *Id.* at

158. He did not get a permit for this work because it was cosmetic. *Id.* Mr. Panaccio explained the patio had an existing concrete base, which he did not remove. *Id.* at 160. Rather, he removed the top, stamped concrete portion and then tiled the patio. *Id.* He denied observing any signs of water intrusion into the home or rotting wood when he tiled the patio. *Id.*

At the conclusion of all testimony, by order and opinion entered on August 25, 2017, the trial court ruled in favor of the Gitomers and expressly found they were not liable on all outstanding claims. Relevantly, the trial court specifically held:

> Both Jane and Glenn Gitomer testified at trial. Both said they were aware of water seepage in that room at ground level and that had been disclosed. They had been unaware of any water damage from the ceiling, which is why they had not disclosed any. They argued that they entertained socially on the [patio] (which they never would have done if they had known of the water damage), and that they had never experienced leaking in the ceiling of the room. [Mrs.] Gitomer testified that they had extensively renovated the room in 2004.
>
> Chilmark presented Joseph Graci, owner and principle of Franklin Engineering, as an expert in civil and structural engineering. Mr. Graci visited the property on October 24, 2015, to assess the structure. He testified that he saw years of water infiltration damage, maybe from as much as forty years, as well as damage from termites. He observed newer wood used to "sister" older wood and wallboard installed "right to the ceiling." He testified that he found no permit for work done on the property in 2003; however, there was an electrical permit for this property in 2004. Mr. Graci did his inspection of the property in this case and testified in this case without remuneration because he felt Chilmark is a "good inspector." The Court finds Mr. Graci's testimony about people and contractors covering up matters is totally speculative and without any basis.
>
> The Gitomers testified that they were entirely unaware of the damage and had never tried to conceal any such information.

- 14 -

Furthermore, they testified that they had never discussed construction permits with their 2004 contractor and had never looked inside the access panel during or after construction was completed. Neither of the Gitomers was able to recall the identity of the contractor used in the 2004 renovation, and any paperwork about the project was discarded when the Gitomers moved from the property.

The Court finds in favor of [the Gitomers] and against [the Chilmark parties]. The Court finds the Gitomers' account credible and finds that [the Chilmark parties] did not sufficiently prove the Gitomers knew or should have known about the ceiling water damage behind the access panel. Furthermore, the Court finds unpersuasive Chilmark's argument that the Gitomers would have covered the damage over with drywall with the intent of concealment ten years before selling the house.

Trial Court Opinion, filed 8/25/17, at 3-4.

On September 1, 2017, the Chilmark parties filed a timely post-trial motion. Therein, with regard to the trial court's verdict that the Gitomers did not violate the Pennsylvania Real Estate Seller Disclosure Law ("RESDL"), the Chilmark parties contended the trial court erred in its interpretation of the RESDL.[5] They specifically argued the following:

[The Chilmark parties] respectfully submit that the Court erred as a matter of law, at least with respect to the claim for violations of the RESDL, because that claim did not require proof that the Gitomers actually knew about the ceiling water damage or that they intended to conceal anything. Rather, [the Chilmark parties] needed only to prove that the Gitomers knew about the 2004 renovation because the 2004 renovation was separately required to be disclosed on the Seller's Property Disclosure Statement. At trial, the Gitomers admitted that they had

_____

[5] The Chilmark parties raised in their post-trial motion, as well as Pa.R.A.P. 1925(b) statement, a claim that the trial court's verdict was against the weight of the evidence as to all claims. However, they have abandoned this claim on appeal, and thus, we decline to address it further.

- 15 -

renovated the rear basement room and it is undisputed from the face of the Seller's Property Disclosure Statement that such renovation was not disclosed. Furthermore, [Mr.] Medlock testified unequivocally and without challenge that had he known of such permitted renovation work, he would not have moved forward with purchasing the [h]ome. [The Chilmark parties] clearly met their burden under the RESDL. [The Chilmark parties'] counsel argued these points in open court following the presentation of testimony.

\*\*\*

Based on the statutory language of the RESDL, the undisputed fact that the Gitomers failed to disclose the 2004 renovation, and the uncontroverted testimony of [Mr.] Medlock that he would not have moved forward with the purchase of the [h]ome, it is respectfully submitted that the Court erred as a matter of law in finding [the Chilmark parties] had not met their burden under the RESDL.

The Chilmark Parties' Post-Trial Motion, filed 9/1/17, at 3-5 (emphasis omitted).

The trial court denied the Chilmark parties' post-trial motion on October 17, 2017, and this appeal followed on October 24, 2017. The trial court directed the Chilmark parties to file a Pa.R.A.P. 1925(b) statement, and the Chilmark parties timely complied. The trial court filed a Pa.R.A.P. 1925(a) opinion on March 8, 2018, in which it relevantly explained the following as to the RESDL claim:

The Disclosure Statement form used by the Gitomers asked, "Have any additions, structural changes, or other alterations been made to the property during your ownership? Itemize and date all additions/alterations below." It is undisputed that the Gitomers answered in the affirmative and listed ten changes on the blanks provided. They did not include mention of the 200[4] [basement] renovation. Jane Gitomer stated that it was omitted "[b]ecause I really thought of it as cosmetic, the same way I thought of changing wallpaper in the house from paint or vice-versa, like if I

- 16 -

had wallpaper and decided to take it down. I really just was changing the look of the room. I didn't think it was structural or alternating [*sic*]."

[The Chilmark parties'] argument that "[they] need only to prove [for RESDL liability] that the Gitomers knew about the 2004 renovation because the 2004 renovation was separately required to be disclosed on the Seller's Property Disclosure Statement conflates the formal requirements for the Disclosure Statement under [Section] 7304 with the [Section] 7311 liability provision.

[The Chilmark parties] argued that Section 7304 creates a "duty" to disclose all alterations that occurred during the seller's ownership, whether or not such alterations constituted defects of any kind, and the violation of that provision invoked the RESDL liability provision. However, [the trial court does] not agree with this interpretation. The duty established by the RESDL is clearly for the seller to disclose "known," "material defects" in the property. The section establishing the duty, [Section] 7303, states that the seller "shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement which satisfies the [statutory] requirements…." The completion of "all applicable items" on the Statement is the method by which "all material defects known to the seller" are disclosed, but ultimately the duty is disclosure of defects. Even if the Gitomers had included the 200[4] [basement] renovation on the form, this would not have constituted disclosure of the water damage, since the Gitomers' contractors had not been hired to address any decay or make any repairs.[7] Contrary to the [Chilmark parties'] suggestion, "alteration" and "defect" are simply not interchangeable for purposes of RESDL liability.

---

[7]The Chilmark parties have not contested Jane Gitomer's assertion that the renovation involved putting up drywall and installing new heating, new carpet, new lighting, [] a new ceiling, and replacing a set of sliding doors.

---

Furthermore, [the Chilmark parties'] reading of the statute is incompatible with the other provisions of the RESDL affirming that the duty is to disclose "known material defects." **See** [68 Pa.C.S.A.] §§ 7308, 7306, and 7309.

Mr. Medlock also testified [] it was the disclosure of the potentially unpermitted[8] 200[4] renovation that would have dissuaded the Medlocks from purchasing the home: "[I]f you had

- 17 -

[8]It is unknown and disputed whether or not the work was actually done without a required permit. Jane Gitomer testified that she did not know if one had been required or obtained, but that she had been involved in many renovations and that she generally relied on the contractors to recognize and address permit issues. She stated that she did not have records of a permit because she had gotten rid of all records pertaining to the house soon after they moved out.

known at the time that you were purchasing the home that…the rear basement room [had prior work done] without a permit, would that have impacted your purchase on this at all?" "We would not have purchased the property….With this, with the permits, I watch home shows, and I know if you have something that is unpermitted, they can come in and tell you that you need to redo the entire room. We didn't want to deal with that." Thus, the Medlocks' purchase decision would have been affected by disclosure of potential future permit problems, not necessarily the disclosure of water damage.

Trial Court Opinion, filed 3/8/18, at 6-9 (citations, emphasis, footnote, and parentheticals omitted) (footnotes in original).

Thereafter, this Court issued an order noting that no judgment had been entered on the docket and directing the Chilmark parties to praecipe for the entry of judgment in accordance with Pa.R.A.P. 301. On November 17, 2017, the Chilmark parties filed the necessary praecipe for the entry of judgment.

On appeal, the Chilmark parties allege the trial court erred in its interpretation of the RESDL. Specifically, they contend the trial court erred in concluding the Gitomers' failure to disclose the known 2004 basement renovation in the seller's disclosure statement was not "actionable" as a violation under the RESDL and/or that they proved actual damages as a result of the violation.

Our standard of review is as follows:

Upon appeal of a non-jury trial verdict, we consider the evidence in the light most favorable to the verdict winner and will reverse the trial court only if its findings of fact lack the support of competent evidence or its findings are premised on an error of law.

When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence.

***Nicholas v. Hofmann***, 158 A.3d 675, 688-89 (Pa.Super. 2017) (citations omitted).

In determining whether the trial court properly construed the RESDL, we must analyze and interpret its statutory language. ***See Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs., Ltd.***, 176 A.3d 263 (Pa.Super. 2017). The rules of statutory construction are well-settled:

The Statutory Construction Act, 1 Pa.C.S. §§ 1901–1991, sets forth principles of statutory construction to guide a court's efforts with respect to statutory interpretation. In so doing, however, the Act expressly limits the use of its construction principles. The purpose of statutory interpretation is to ascertain the General Assembly's intent and to give it effect. In discerning that intent, courts first look to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent and not look beyond the statutory language to ascertain its meaning. Courts may apply the rules of statutory construction only when the statutory language is not explicit or is ambiguous.

We must read all sections of a statute together and in conjunction with each other, construing them with reference to the entire statute. When construing one section of a statute, courts must read that section not by itself, but with reference to,

- 19 -

and in light of, the other sections. Statutory language must be read in context, together and in conjunction with the remaining statutory language.

Every statute shall be construed, if possible, to give effect to all its provisions. We presume the legislature did not intend a result that is absurd, impossible, or unreasonable, and that it intends the entire statute to be effective and certain. When evaluating the interplay of several statutory provisions, we recognize that statutes that relate to the same class of persons are *in pari materia* and should be construed together, if possible, as one statute.

***Retina Assocs. of Greater Phila., Ltd.***, 176 A.3d at 27 (citations and internal quotation marks omitted).

By way of background, the RESDL, which became effective on December 20, 2001, applies "to all residential real estate transfers" except for certain types of transfers, none of which is applicable here. ***See*** 68 Pa.C.S.A. § 7302. With these legal precepts in mind, we set forth the following relevant provisions of the RESDL:

Section 7304, titled "Disclosure form," relevantly provides:

**(a) General rule.--**A form of property disclosure statement that satisfies the requirements of this chapter shall be promulgated by the State Real Estate Commission. Nothing in this chapter shall preclude a seller from using a form of property disclosure statement that contains additional provisions that require greater specificity or that call for the disclosure of the condition or existence of other features of the property.

**(b) Contents of property disclosure statement.--**The form of property disclosure statement promulgated by the State Real Estate Commission shall call for disclosures with respect to all of the following subjects:

***

(7) Additions, remodeling and structural changes to the property.

68 Pa.C.S.A. § 7304 (bold in original).

> Section 7308, titled "Affirmative duty of seller," relevantly provides:
>
> The seller is not obligated by this chapter to make any specific investigation or inquiry in an effort to complete the property disclosure statement. In completing the property disclosure statement, the seller shall not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive or misleading and shall not fail to disclose a known material defect.

68 Pa.C.S.A. § 7308.[6]

> Section 7311(a), titled "Failure to comply," relevantly provides:
>
> **(a) General rule.--**A residential real estate transfer subject to this chapter shall not be invalidated solely because of the failure of any person to comply with any provision of this chapter. However, any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter shall be liable in the amount of actual damages suffered by the buyer as a result of a violation of this chapter. This subsection shall not be construed so as to restrict or expand the authority of a court to impose punitive damages or apply other remedies applicable under any other provision of law.

___

[6] Section 7303, titled "Disclosure of material defects," specifically addresses a seller's obligation to disclose known "material defects" and provides:

> Any seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement which satisfies the requirements of section 7304 (relating to disclosure form). A signed and dated copy of the property disclosure statement shall be delivered to the buyer in accordance with section 7305 (relating to delivery of disclosure form) prior to the signing of an agreement of transfer by the seller and buyer with respect to the property.

68 Pa.C.S.A. § 7303.

68 Pa.C.S.A. § 7311 (bold in original).

Here, the trial court concluded the Gitomers were unaware of the water problem in the basement of the house until after the sale of the house, and thus, they did not violate the RESDL by failing to disclose the water problem. The Chilmark parties do not challenge the trial court's findings of fact or legal conclusions in this regard. However, as indicated *supra*, the Chilmark parties contend the trial court erred in failing to conclude the Gitomers' failure to disclose in the seller's disclosure statement that they made additions/remodeling/structural changes to the basement in 2004 (of which the Gitomers were obviously aware) requires a finding that the Gitomers violated their duty in this regard under the RESDL. We agree.

Section 7308, by its title and plain language, imposes an affirmative duty upon the seller. Specifically, Section 7308 provides: "**In completing the property disclosure statement, the seller shall not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive or misleading** and shall not fail to disclose a known material defect." 68 Pa.C.S.A. § 7308 (emphasis added).

Contrary to the trial court, we do not interpret Section 7308 to limit the seller's affirmative duty to disclose only "known material defects." Rather, by its plain, unambiguous language, Section 7308 also affirmatively requires the seller, in completing the property disclosure statement, to "not make any representations that the seller or the agent for the seller knows or has reason

to know are false, deceptive or misleading[.]"[7] 68 Pa.C.S.A. § 7308. **See**

**Koken v. Reliance Ins. Co.**, 586 Pa. 269, 893 A.2d 70, 81 (2006) (holding

"the term 'shall' is mandatory for purposes of statutory construction when a

statute is unambiguous") (some internal quotation marks and citation

omitted)); 1 Pa.C.S.A. § 1903(a) ("Words and phrases shall be construed

according to rules of grammar and according to their common and approved

usage[.]").

In the case *sub judice*, the seller's disclosure statement called for the

disclosure of "[a]dditions/alterations."[8] It is undisputed that, in response

thereto, the Gitomers represented they were aware of the following

additions/alterations: kitchen renovation, three bathroom renovations, new

---

[7] As this Court recently noted:

> [The] RESDL is intended to protect the purchaser of real property, and the method of protection is a disclosure statement that is included within the bill that the seller has to complete so that presumably the buyer accurately knows what the seller knows about the property when the sale occurs.
>
> ***
>
> In sum, the Pennsylvania legislature noted the RESDL protects the purchasers of real property and ensures that both parties have some parity of knowledge regarding any issues with the property.

**Phelps v. Caperoon**, --- A.3d ---, 2018 WL 3016477, at *13 (Pa.Super. filed 6/18/18) (quotation marks, quotation, and citation omitted).

[8] While the language in the RESDL calls for disclosure of "additions, remodeling and structural changes to the property," the disclosure statement in the instant case called for the disclosure of "additions/alterations." However, the Chilmark parties have not raised a claim concerning this discrepancy.

window in the dining room, new French doors in dining room, new tiled deck and fencing, new electrical panel board, new HVAC system, new driveway, new black fencing, and new front path lighting. However, it is equally undisputed that, although they were aware of the basement alteration in 2004, the Gitomers did not disclose such information on the statement. That is, viewing the evidence in the light most favorable to the Gitomers, as verdict winners, it is clear that their answer to the portion of the form related to disclosing "[a]dditions/alterations" was "false, deceptive or misleading" and they knew or had reason to know. **See Nicholas**, **supra** (setting forth our standard of review).

Having concluded the Gitomers failed to fulfill their affirmative duty in this regard, we turn to Section 7311, which sets forth the liability for a seller's failure to comply. Relevantly, Section 7311 provides that "any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter **shall be liable in the amount of actual damages suffered by the buyer as a result of a violation of this chapter**." 68 Pa.C.S.A. § 7311 (emphasis added).[9] Thus, the inquiry is whether, viewing the evidence in the light most favorable to the Gitomers, as verdict winners, the Gitomers were, at the very least, negligent in failing to disclose the 2004

_____

[9] This Court recently set forth the measure of "actual damages" under the RESDL as "repair costs, capped by the market value of the property." **Phelps**, 2018 WL 3016477, at *13 (footnote omitted).

basement renovation and whether the Medlocks suffered actual damages as a result thereof.

Assuming, *arguendo*, the Gitomers were at least negligent in failing to disclose the 2004 basement renovation, we agree with trial court that the Chilmark parties have failed to establish the Medlocks suffered actual damages as a result of this violation. For instance, the Chilmark parties do not suggest that the Medlocks would have discovered the existing water damage had the Gitomers disclosed the 2004 basement renovation in the seller's disclosure statement.[10]

At most, from the Chilmark parties' brief, we glean the following argument as to causation and actual damages: The Gitomers were required to secure a building permit for the 2004 basement renovation; the Gitomers failed to secure a building permit; Mr. Medlock unequivocally testified the Medlocks would not have purchased the home if the 2004 basement renovation required a building permit and such was made without it; and thus, the Gitomers' failure to disclose the 2004 basement renovation deprived the Medlocks of discovering the unpermitted renovation. Chilmark Parties' Brief at 15; Chilmark Parties' Reply Brief at 3.

---

[10] In its opinion, the trial court found there was no evidence that, if the Gitomers had included the 2004 basement renovation in the seller's disclosure statement, this would have led to the disclosure of the water problem, of which the Gitomers were unaware. *See* Trial Court Opinion, filed 3/8/18, at 7.

However, as was within its province, the trial court did not find credible Mr. Graci's testimony that the Gitomers were required to have a building permit and/or they failed to secure the necessary permits. **Nicholas**, **supra**. Further, the trial court, pointing to Mrs. Gitomer's testimony, concluded it is "unknown" whether the basement work was completed without a required permit.

Moreover, the trial court noted that, while Mr. Medlock testified the Medlocks would not have purchased the home if an unpermitted renovation was made to the basement, he indicated his concern was that someone would require him to "redo" the room because of a permit violation. N.T., 8/21/17, at 46. However, there is no indication anyone complained to the Medlocks about a permit violation or asked them to "redo" the basement for this reason.

We conclude the trial court's factual findings are supported by the record. **Id.** Thus, under the circumstances of this case, as it was the Chilmark parties' burden to establish the necessary elements for the RESDL claim, we conclude they failed to meet their burden of establishing the Medlocks suffered actual damage as a result of the Gitomers' failure to disclose the 2004 basement alteration.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/31/18</u>